07-1506 Taltech LTD v. Esquel Enterprises Mr. West? Good morning. May it please the court, the district court in this case clearly erred in a number of respects. First, in finding inequitable conduct. Next, in finding a best mode violation, which rendered the patent invalid. In finding the case to be exceptional. In its rulings on claim construction. In its findings on summary judgment of non-infringement. And finally, its decision after trial. In finding no infringement. And in awarding attorney's fees. Now that's a lot to cover in 15 minutes, so I invite your questions early and often. I will start with inequitable conduct. Clearly there was no materiality, nothing material withheld. The district judge thought that the undisclosed raincoat seam was material, and that it was withheld with intent to deceive. But it wasn't material at all, because essentially identical and even more relevant prior art had already been submitted by TAL to the examiner early in the prosecution. Mr. West, how do we weigh materiality versus intent? The only evidence of intent in this case is the judge's inference that the, and it's in his conclusions of law 81 and 82, he thought that because the undisclosed seam was material, which it wasn't, that therefore there must have been intent to withhold it. And so there was no evidence of an intent to deceive other than based on his inference based on materiality, which was erroneous. You would not argue, would you, that the undisclosed seam would have been immaterial but for the argument that it was cumulatively erroneous, correct? I haven't thought deeply about that, but I think there is an argument that it wouldn't have been material even without Robert's. But the explanation for that is not in the record, so I won't argue it. Sure looks a lot like the claimed seam. No, it doesn't. Because the nature of the seam is different. The way the seam is folded is entirely different. But the actual structure, as opposed to the way you get to the structure. No, the actual structure of the undisclosed seam is also different. The structure of the undisclosed seam is exactly the same as the structure of the disclosed seam, except that the undisclosed seam has only one top stitch, whereas the disclosed seam has two top stitches. But the Robert's also had one top stitch, exactly as in the undisclosed seam. Nobody can point out any difference between, nobody can point out any difference between the undisclosed seam and the Robert's. And we put it on page four of our reply brief. It's right there. They're the same. One top stitch here, one top stitch here. One top stitch in Robert's, one top stitch in the undisclosed seam. Now what is the difference between, let's say, the undisclosed seam and, let's say, figure 3B of the patent, setting aside the fact that the bonding material in the undisclosed seam is in a U shape? The undisclosed seam versus the 779 patent? Yes, 3D. Well, the difference is that they are, the seam structure is different. Well, the difference is that they're different. How are they different? Well, they're folded differently so that the, well, the only thing I could, the best way I could point out to say is that the claim doesn't read on either the disclosed seam or the undisclosed seam because of the way the seams are folded and the way that the bonding element intersects with portions of both seams, both, pardon me, portions of both components. You see in the patented seam, the adhesive that, what I'll call the top layer of adhesive to distinguish between the patented product and the Asquel product has two layers of adhesive. Only the top layer is the layer that's, of the Asquel is the layer that's disclosed and claimed in the 779 patent. But you'll notice in the patent, there is, there are two butting sections of two components that come together in the center of the seam and are held together by the adhesive. And that is not true in either of the disclosed seam or the undisclosed seam. Okay. And particularly, I would direct your attention to figure four, which is the preferred embodiment, which is the one that's more directly, should be compared with the Asquel seam. Now, anyhow, I'll turn to best mode. Is there no further questions on inequitable conduct? The best mode, it was simply a case of the district judge not realizing that thickness of adhesive in this art was measured not in terms of inches or centimeters or millimeters, but rather was measured in terms of grams per square meter or some equivalent measure. In the patent, the patentee set out the range of adhesive thickness in terms of grams per square meter. That satisfied his best mode requirement. The district judge simply failed to recognize what everybody in the art knew, which was that that was the way that thickness was measured in this art. Well, what about the fact that he was testing various thicknesses and did not disclose the one that really was the best to use? There was no best one to use. It all depends, as the art will also show you. Look at the Russell 980 patent. The amount, when you're talking about thickness of adhesive, you're really talking about the proper amount to use. And that's going to vary depending on whether you're talking about a thin fabric or a thick fabric. So that's why he stated it as a range of thicknesses in grams per square meter because it's a range that's appropriate because there is no one single best mode. It depends on the fabric you're choosing. It also depends on other factors. So there, and he made this very clear in his testimony that, well, I use one thing for one fabric. I use another for another. What about the SL33 that he kept referring to? That's one that he, his testimony is very clear that he preferred SL10, but apparently he didn't have a supply of it. So SL33, if you had two layers of it, it approximated the thickness or the grams per square meter of SL10. So that's why he used a double layer of SL33. Apparently he didn't have enough of the SL10, but that's what the record shows. Judge, there is no best mode. He used SL33 because it was available. And as this court has said repeatedly in various cases, going back to the Wald case, the relevant question is not whether an inventor preferred one thing or another, but why he preferred it. If he preferred it because it was the only one he thought would work, then it may be a best mode. But if he just preferred it because it was available, he had it, that was fine. You mentioned, you've said it repeatedly during this dialogue with the judge, testimony is very, very clear, but you emphasized in here that he was, he had difficulty understanding and speaking. And the judge, and the point is the judge had to make a lot of credibility findings in this case, more than normal. Sure. And he seems to have thought that the man was dissembling it a lot. Yes, he did. And how are we going to get behind that? That's one, let me explain that, because what he thought that the man was dissembling about was when he first learned about the undisclosed scene. One time he said, well, maybe it was then, another time he said, maybe it was some other time. The judge thought this was all material because the judge thought that the undisclosed scene was material, but it wasn't. But if you look at the record, that's the only reason the judge thought that this guy was dissembling. But the point was, it doesn't matter whether he was confused, lying, anything about when he knew about the undisclosed scene, because it wasn't material. That's the bottom line, it wasn't material, because the identical prior was already before the examiner. If we think it was material, then it's credible to find that we may have done it a lot better. If you agree it was material, then I will concede my argument fails. But I think you will find it wasn't material. Turning to claim construction, the district judge erred in a number of respects. We've covered them all in our brief. His errors started off with thinking that step E of the claim, claim 18, must follow step B. And what he did was impose an order on the steps of the claims, which wasn't justified by anything in the intrinsic evidence. He simply misread the wording of clause E and assumed that it was the same as clause D, and that since Talad agreed that clause D must come after clause B, he said, well, therefore, clause E must too. But he was wrong, because he simply misread the wording of clause E. Clause E says nothing about folding over the bonding element. So he just made a simple misreading error. He also misread clause G, because he thought that folding such that must have an immediate causal reaction or effect. And he thought that because he saw the words to cause in clause G, and he said, well, that must be the same as these other clauses. But to cause appears only in clause G. It doesn't appear in clauses A, B, C, D, or E. Let me ask you this question. If I understand the Eskol method, they put the U-shaped adhesive. The picture at JA 31061 is the one that the parties wrote. Was it like this? No. The one I'm looking at is 31061. Right, that's what we were cited to at several points as indicative of the Eskol method. Is that right? Is that correct? That's figure 18 of their patent, and that's substantially the same. Now, if I understand the way Eskol does it, according to this set of drawings, they put the U-shaped adhesive around each of the separate components first, and they put a stitch through to hold it on. Correct. Right. Now, the question I have is, why would, at that point, the point the bonding agent is attached to each of the components, there's no seam as such. There is no seam at that point. So why, then, is the Eskol system not fail Part B of Claim 1, which is the independent claim, placing a bonding element, having at least a thermal adhesive component along the seam, such that a lower surface of the bonding element abuts an upper surface? Well, the district judge recognized, if you look at his findings of fact 90 and 91, you will see that he did recognize that in Eskol's product, they achieve that relationship of Clause B. But he thought that they achieved that relationship when they did this, just seam of the adhesive around the edge. See, he thought that, he said, aha, that brings the top part, or the, if you just look at the top section here, of the. Well, I'm focusing on the along the seam. I know, I understand what you're, I know where you're going. OK. I'm trying to answer, but it makes it, it's a problem. All right, that's fine. As long as we're all on the same page. If you look at his findings 90 and 91, he recognized that the relationship was achieved. He thought it was achieved in this step, the step that's shown here in chart two, the top of 31 and 61. But, and he said, well, that's not, that doesn't happen. And then look at conclusion of law 22. And you'll see what he was thinking. He says, aha, the placing along the seam, not this step of seaming the adhesive to the edge, is what must cause the relationship. So what Asquel has done here is basically take the step of placing along the seam and divided it into two subparts. First, they put the adhesive around here, and then they place the adhesive there, then they place the edge here, which is along the seam. In chart E, that illustrates along the seam. But the relationship that's called for in clause B is the same both here and here. So the such that is still maintained, is still present when the seam is placed, when the seam is created, when it's placed along the seam. So if you look at it, I'm trying to answer this in the answer. Well, I think you have answered it. You're used up. You've got to rebuttal time, but we'll give you a few minutes. Thank you very much. Mr. Chilton, if you need a little extra time, you can take it. Thank you, Your Honor. May it please the court, I, too, would like to begin with the inequitable conduct issue. Obviously, it resolves all of the other issues in the case if this court should affirm Judge Zille in his decision below because the other issues would no longer matter. The fundamental error that Tal makes in discussing inequitable conduct is its attempt to divorce the disclosed and the undisclosed seams from the affirmative misrepresentations that Mr. Wong made in the 1996 amendment. Let's first, if you don't mind, could we deal with the problem of rovers and the question of whether that part of, you make an argument that the rovers was cumulative argument was not made to the district court. In their reply brief, your opposing counsel comes back with, on page five of the reply brief, portions from the proposed findings, in fact, conclusions of law that seem to say just that. Yes, Your Honor. Would you agree that it was raised to the district court? It was, and if I may explain. Perhaps we didn't place it felicitously in our brief, but the point we were trying to make is that rovers was first mentioned to the district court in closing argument before the trial court. The rovers patent was never itself a separate exhibit below. It was just part of the paper that was part of the prosecution history. It was not argued to the court in opening statement to make the other pieces of our cumulative. There was no live testimony before Judge Sotomayor. These findings of fact and conclusions of law were submitted pre-trial, right? Yes. All right. Did the documents that were offered to the court, including the rovers patent, were available at that time? They were, but as we point out at page 28 of our red brief, Your Honor, rovers was argued in the pre-trial filings to be different from the patent. They were arguing about the validity issue at that time. So essentially, they were telling the court, up until the very last closing argument, that rovers was very different from the patented invention because they were concerned about our argument of validity. But it isn't a question of whether they were like the patented invention. The key is whether it was like the undisclosed scene. And they argue, even today, Mr. West is arguing strongly that neither rovers nor the undisclosed scene are like the invention, but he's taking the position that they are like one another, which is the question that we need to address. And they do look an awful lot alike. They look a lot alike, Your Honor. It's what wasn't told about the undisclosed scene that's important. If Mr. Wong had been truthful to Judge Zille and had been truthful to the examiner, more importantly, and had disclosed the undisclosed reference, he would have also disclosed the fact that the undisclosed reference used Vylene SL-33. And that's something that rovers doesn't teach because rovers doesn't specifically teach a binding element. Also, rovers compounds the lies to the examiner because, as I was about to say earlier, the fundamental misrepresentation was Mr. Wong attempting to trivialize the raincoat art and separate it from the dress shirt art. Rovers continues that misrepresentation because rovers at several different points argues away from using raincoat art in the dress shirt art. For example, rovers at page 3 says, this type of embodiment is suitable for use especially in the outer garment industry. Rovers says, this embodiment is especially well suited for fully padded patterns. Now, how does that relate? Judge Zille found that one of the reasons that the undisclosed seam was material was because the undisclosed seam would have taught that the raincoat art and the dress shirt art, in fact, are very similar. And concepts from one can easily be imported into the other. But not necessarily the thickness of the glue, right? Well, isn't there a difference between a raincoat art and a shirt art as far as the thickness of the glue is concerned? There may be. There wasn't any real testimony about that, Your Honor. Certainly, the undisclosed seam would have taught the brand. Rovers doesn't really teach how much to use. And interestingly, Your Honor, when arguing about the validity issue in rovers, Tal suggested that rovers didn't prefigure Mr. Wong's invention because a person of ordinary skill reading rovers wouldn't know how much adhesive, how much glue to use. In other words, they actually, in the course of arguing validity, made our point about best mode, that Mr. Wong knew exactly what kind and how much glue worked and how much didn't work. Would you know how much to use, how much glue to use in the undisclosed seam, the undisclosed raincoat seam? I'm not sure I understand that question. You're saying that rovers does not disclose the amount of glue that would be used. Right. Is that amount of glue disclosed in the undisclosed raincoat seam? Well, yes, it is in this way, Your Honor. Mr. Wong did testify that Vylene SL-33 was used in the undisclosed seam. And we see in the undisclosed seam a folding over of the SL-33. So that would disclose a double layer of SL-33. Well, it's also disclosed in rovers too, isn't it? Well, but rovers, you don't know from rovers which, rovers doesn't disclose the SL-33. And I think that's the key point. But it does disclose some kind of glue to be used. Some kind, yes. It discloses some kind. So it's not just. So maybe rovers has a problem also in disclosing the best mode. Well, when my client gets sued with regard to infringing rovers, maybe I'll be back in front of you arguing that, Your Honor, but not today. Rovers very well may have a problem with best mode. But it's interesting that Towles' focus on that, for validity purposes, then did a double take 180 degrees when they were arguing best mode in Mr. Wong's own patent. The argument that they make about rovers is actually the same argument that we're making with regard to best mode in Mr. Wong's patent. But if I may, Your Honor, I would like to direct the court's attention to the specific words used in that 1996 amendment. They appear at the joint appendix 30235, 30,235. Because what Towles is trying to do is separate each of these little facts and then argue separately that they are not material or are not substantially false. But it's the facts together that Judge Zillig found to be misleading. Excuse me, what was that page again? It's 30235, Your Honor. It's page 16 of the 1996 amendment. And right there on that page, Mr. Wong, of course, shows that's the disclosed seam. And the disclosed seam looks an awful lot like his patented product. So he has to argue about how it might be different. And he says, although this prior structure for raincoats is operable to prevent seam structure, it's not satisfactory for garments in accordance with the present invention, particularly shirts. And then he gives two reasons. He says, although the open edge can be avoided by incorporating an overlock stitch along the edge, this stitch is unacceptable in most applications, particularly shirts, because it increases the thickness of the seam and is uncomfortable as it rubs a wearer. In fact, most retail firms find overlock seam structures unacceptable. Now, this wasn't just sloppy language. This was an affirmative misrepresentation of fact by Mr. Wong. Can you help me with what is an overlock stitch? I understand what the other stitches involved here. Obviously, I had to learn this for this case, too. The thing that's trying to be avoided here is having what's called an open seam, which means that the material is cut, and then there's nothing to stop it from fraying. An overlock seam would go around the outside, essentially binding around in a circle in the same way that the wire binds my little booklet here. That's what an overlock seam would look like. And the purpose here was to say, well, when you look at the disclosed raincoat seam, yes, there's an open seam there. And a person of ordinary skill would know if you were going to use that in a dress shirt, maybe you could put an overlock seam, and then it would be acceptable. However, Mr. Wong then says, but nobody uses overlock seams in dress shirts. That wasn't true. His own company, for many years, had sold quite a few dress shirts having these overlock seams. And in fact, at the time he made this misrepresentation, his company was still selling 5% of its shirts with these overlock seams. This was an affirmative misrepresentation of fact that argued against, or I should say, Mr. Wong failed to disclose the truth about his own company's sales of dress shirts in light of his affirmative misrepresentation to support an argument of patentability, exactly the kind of thing that this court in the Monsanto versus Bayer case found to be the basis for an inequitable conduct finding. Would you think that this would have been not misleading if instead of unacceptable, he had written not preferred? That might have assisted it. But notice what the change in that language would have meant. All of a sudden, rather than saying you don't see this in dress shirts, it's not preferred in dress shirts. No, it's not. His invention, what he's saying is his invention solves this problem. And therefore, this is not disqualifying prior, right? I'm not sure I follow that. No, in other words, I guess where I'm going with this is why does it matter whether other dress shirts, which are not the dress shirts he's trying to manufacture, may use an overlock seam? Because he knew that a person of ordinary skill in the art would understand his invention. A person of ordinary skill in the art who knew raincoat seams would already know his invention. Because people were using violin SL33 on their seams for many, many years. He was afraid of that, and he was trying to trivialize the raincoat seam art so that the examiner wouldn't look at raincoat seams anymore. And so every time he had the opportunity, he kept distinguishing raincoat seams from dress shirt seams, arguing that his invention, which of course all he talked about are dress shirt seams in his specification, that dress shirt seams are somehow different from raincoat seams. And so he was trying to avoid an obviousness. But what he's saying, it seems to me as he's saying good dress shirt seams are different from raincoat seams. It doesn't really say that. No, but the question is, why does it really matter that he's, maybe it would have been preferable to say, you know, nice dress shirts instead of, he probably doesn't want to impeach his own dress shirts. But dress shirts that don't have this overlock seam are the preferred dress shirts, and that's what I have given you a way to obtain. Well, if he had said that, Your Honor, then I would imagine the examiner would have required him to write claims directed to good dress shirts. Or to somehow, his claims cover all kinds of shirts. And they cover this seam, whether it's in a dress shirt or a different shirt, I assume. Yeah. OK. And so, Your Honor, we've looked at the disclosed seam. The undisclosed seam, as well, relates to the representations made in the 1996 amendment. The undisclosed seam, again, would have told the examiner that the raincoat art is important, well-known, and understandable to persons who are designing dress shirt seams, as well. The raincoat art, of course, in the 1996 amendment, Mr. Wong says that one reason that you shouldn't look at raincoat seams is that they have the two top stitches, and no one would do that with dress shirts. So he was differentiating raincoat seams with the two stitches from dress shirt seams with one top stitch. The undisclosed seam had only one top stitch, and yet it was a raincoat. And again, if he had explained that to the examiner, the examiner would have realized that there really is no difference between the seams you make for raincoats and the seams that you make for dress shirts. And the examiner should be looking at these raincoat seams and scrutinizing them. You know, Tao complains that one reason that you can find that the disclosed seam is not material is because the examiner didn't give it much consideration. That's like a person who kills his parents throwing himself on the mercy of a court because he's an orphan. The reason that the examiner didn't consider these raincoat seams to be material and didn't talk a lot about the disclosed raincoat seam is because Mr. Wong lied to him and told him that he shouldn't worry about raincoat seams, because they didn't address the problem that he was trying to address in his patent. And that just wasn't the case. The seams were very similar. Counsel, I have a problem with the abutting definition by the court. Can two pieces abut if there's a third piece in between? Not in this particular case, Your Honor. Certainly, that's what Judge Zille found, that abutment requires touching. And he based that on the way the words were used in the specification. And it seems to me that Tao's argument about abutting relies on dragging dictionary definitions in that weren't even given to Judge Zille. So I don't know. Well, the abut definition was not in the intrinsic evidence. It was not, yes. So is that fair that the judge could use the dictionary to determine what abutting means? Well, but the dictionary that Tao cites and refers to in its brief is a dictionary that was not presented to Judge Zille at the time. So based on what Judge Zille had in front of him at the time of the claim construction and the deed at trial. What did he have in front of him at that point? He had the language of the specification. Now, the specification does not describe abutment. It doesn't call out a specific definition of abutment. That's true. So if two pieces are together and they're separated by glue, are they abutting? No, I would say no. Is that a definition that needs to be reconsidered, not pursuant to summary judgment? He found non-infringement on the basis of summary judgment at that point. Yes, he did, Your Honor. And I don't see what the argument from the other side on reconsidering it was, because I don't see the other side pointing to any intrinsic information in the specification of the prosecution history that would support their decision. So why should Judge Zille's determination be overturned? There's no argument from the intrinsic evidence to overturn it. I'm not saying overturning the definition, but maybe overturning the basis of a summary judgment determination of non-infringement, where there could still be a question of fact as to whether two pieces abut when there's a thermal piece in between, thermal glue. Well, Judge Zille, below, of course, there was an effort to use these micrograph photos to show that there might be some threads that touch. And Judge Zille properly found that that certainly didn't amount to abutment under his previous decision in the case. And there was no effort to put on a doctrine of equivalence argument. It seems to me that the kind of argument that Your Honor is leading to is one that might have been appropriate to argue as doctrine of equivalence in the case where the claim is interpreted as it is. But there was no effort to make that doctrine of equivalence argument at the time of trial. DOE was not appealed. I'm sorry? DOE has not been appealed. It has not. Thank you, Your Honor. If there are no more questions. Thank you. May I have three minutes? We have a couple. OK, thank you. First, if you want to understand the difference between rain coat art and shirts, all you have to do is look at the judge's finding 101, 101. Look at that, and you'll understand the difference. With respect to inequitable conduct, I was listening very carefully to see if I heard counsel for the appellee point out any difference between the undisclosed rain coat scene, the only evidence of which is the drawing that Mr. Wong made in his deposition, and the Robert's prior art. And he didn't point out anything. We've challenged them repeatedly to do that. They can't do it. We brought up Robert's not only at trial in the pretrial findings and argued it in the final argument. We've got those citations in our brief. But we also brought it up. It was also a point in the summary judgment motion that was prior to trial. With respect just to the trial proceedings, and setting aside summary judgment, because if you'd raised it in summary judgment but not at trial, you'd get one. OK. Now, exactly what did you do to raise it? It was in your pretrial proposed findings of fact. OK. And the document, Robert's document, was with the exhibit to that point? It was part of the prosecution history that was in evidence. It was right there in the prosecution history. It couldn't be missed. No witness testified about Robert's, I take it. I don't recall one, but the whole issue was thoroughly vetted in the pretrial proceedings on the motion for summary judgment. We cited that in our brief as well. But it was part of the final argument, too. We cited that in the pages in the appendix. We cited it in the brief. Now, the prosecution statements Mr. Shunt pointed to, what he talked about, all shirts, all this, all that, it didn't say that. What it was talking about was most, and Judge Bryson, you were exactly right. That's what the attorney was pointing out. What he was saying was that this overlock seam, which I agree with the description of that, but that the overlock seam would just add to the thickness of this thick butt end of the seam, which would make it uncomfortable. So he was saying that you could use an overlock seam. That might help prevent fraying, but it would also just add to the thickness, and so that would just make it worse in that other respect. That's all that he was saying in the prosecution history. And the reference to topstitches, as I've pointed out repeatedly, it doesn't matter how many topstitches there were, because the prior art before the examiner had both two topstitches. And in Robert's and in the undisclosed seam, both a single topstitch. So it didn't matter. It wasn't material to anything. Now, going back to the, if you just take the. Your time's expired, Mr. West. Thank you. Thank you very much. The case is submitted.